UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA, the States of
FLORIDA, GEORGIA, and NORTH
CAROLINA, and the Commonwealth of
VIRGINIA ex rel. BALBINA CASTILLO,

               Plaintiff/Relator,

v.

VISTA CLINICAL DIAGNOSTICS, LLC,
ADVANCED CLINICAL LABORATORIES,
INC., ACCESS DERMPATH, INC., CF
MEDICAL BILLING, LLC, and DAVIAN
SANTANA

               Defendants.

_____/

**TO BE FILED UNDER SEAL**

Case No.:

## RELATOR'S COMPLAINT

Relator, Balbina Castillo, hereby submits the following Complaint under seal in accordance with the requirements of the False Claims Act, 31 U.S.C. §3730(b)(2); the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*; the Georgia False Claims Acts, 31 U.S.C. §3730(b)(2) and Ga. Code Ann. §§ 49-4-168 *et. seq.*; and the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* and further states as follows

## I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.    Vista Clinical Diagnostics, LLC, Advanced Clinical Laboratories, Inc., Access Dermpath, Inc., and their founder, Davian Santana, (hereinafter collectively referred to as "Defendants"), have developed a scheme that has led to systemic fraudulent billing submissions to Medicare and Medicaid. Defendants have implemented a scheme to bill Medicare and Medicaid that is not new,

or even unique, as it has been around for quite some time. This scheme, known as "code jamming",

occurs whenever a provider, such as the labs operated by Defendants, adds diagnosis codes to a

Medicare or Medicaid beneficiary reimbursement submission that have nothing to do with the

patient's condition and are not provided by the patient's physician when ordering lab work.

Defendants use macros, which are a saved sequence of commands or keyboard strokes that can be

stored and then recalled with a single command or keyboard stroke and have been created in-

house, to add diagnosis codes to a large number of their patient's submissions strictly to assure

reimbursement will be made by Medicare and/or Medicaid and/or to assure a higher

reimbursement will be forthcoming from Medicare and/or Medicaid. A specific macro is added to

billings based on what CPT Code has been ordered by the beneficiary's physician.

### Screenshot of Macros maintained on Defendants computer systems



## Instructions on how to insert Macro with diagnosis codes



### Michigan Billing Reports

1. Open Clermont Harvest
2. Run the B5R MICHREF CLINICAL file; choose the appropriate start/end date (end day should always be next day at 12:01am).
3. When the file loads, sort by patient name, then export. Save to: I:\Business Services\Billing\BillingAllUsers\Part B Billing Reports\Out of State Billing Reports\2019\Michigan
4. Open a blank workbook in Excel, choose "data", "get data", "legacy wizards", "from text", select the .csv file.
5. Choose "delimited", check "my data has headers", press next, check "comma", press next, highlight all columns, choose "text", press finish. Press ok.
6. Scroll through to ensure all addresses are filled in under columns E & G; if anything is missing, fill it in. If there is anything in column F, leave it as is.
7. Scroll over to view column H, I & L to ensure there are no blanks, no dashes, caps, TBDs, inaccurate information, etc. Verify against reqs & SMART, etc. as needed. Fix on file and in Copia.
   a. Ensure all Medicare is in as Medicare Part B (USE).
   b. Ensure all WPS is in as Medicare Part B (USE).
   c. Ensure all Medicaid for Michigan patients is in as Medicaid Michigan.
   d. Ensure all Medicaid for Oklahoma patients in in as Medicaid Oklahoma Soonercare.
   e. Ensure all Blue Cross is in as Blue Cross Blue Shield Michigan
   f. Delete all lines for client bill patients
8. Do the same (step 7) for secondary insurances.
9. In Payor Source column, make sure all are Part B or Patient Bill or Hospice, etc.
10. In Billing Status column, make sure all are Insurance Bill or Patient Bill.



10. In Billing Status column, make sure all are Insurance Bill or Patient Bill.
11. In Race column, make sure all are "N/A".
12. Scroll over to Specimen column & put in A-Z order.
13. Scroll to Providers column & put in A-Z order.
14. In column X, apply Macro & removed duplicates accordingly.
15. Scroll to column A, patient name & put in A-Z order.
16. Insert a blank line above line 1, scroll down to the "P" area of the patient names to copy & paste the headers back to the top of the spreadsheet, then scroll back down and delete the line they were on prior.
17. Save to: I:\Business Services\Billing\BillingAllUsers\Part B Billing Reports\Out of State Billing Reports\2019\Michigan as .xlsx.
18. Follow the same steps for Michigan Micro & Path files as well. Add any patients that are missing info to the same "awaiting information" file.
19. Files get saved as (examples):
    a. Michigan Billing Report – 8.8.19-8.12.19
    b. Michigan Billing Report – Micro – 8.8.19-8.12.19
    c. Michigan Billing Report – Path – 8.8.19-8.12.19

For Exceptions/missing info:

Photo of a laminated card used by Defendants prior to implementing the software macros



2.     The Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), issued guidance as long ago as 1998 in the Federal Register in publication of the "Compliance Program Guidance for Clinical Laboratories". In this publication HHS-OIG specifically stated that:

> Laboratories **should not:** (1) Use information provided by the physician or other authorized individual from earlier dates of service (other than standing orders, as discussed below at paragraph 4); (2) create diagnosis information that has triggered reimbursement in the past**; (3) use computer programs that automatically insert diagnosis codes without receipt of diagnostic information**

*from the ordering physician or other authorized individual; or (4) make up information for claim submission purposes.*

3.      As early as 2014, Defendants have been adding diagnosis codes to Medicare and/or Medicaid beneficiary claims.   Initially, the manipulation was done manually, but soon after Defendant began using computer program macros so that more claims could have diagnosis codes added to them quickly, in strict contradiction to guidance issued by HHS-OIG in an effort to address the precise type of fraud that was being conducted by laboratories like Defendants. Defendants maintain a spreadsheet with a list of CPT Codes that would normally be ordered by a physician when requesting laboratory testing. A macro is designated to be used for specific codes that allows for the systematic adding of additional codes not used by the physician.

4.      Defendants, in addition to defrauding Medicare and Medicaid by "code jamming", are also engaged in a "swapping" scheme with numerous skilled nursing facility ("SNF") clients. Defendants are engaged in "swapping" discounted laboratory services in exchange for referral business that is billed at the customary rate. Defendants are offering inducements to SNF clients in the form of reduced rates for Medicare Part A services in return for exclusive referrals from the SNF clients for Medicare Part B services that are billed at the full "fee for service" amount, in direct violation of the Federal Anti-Kickback Statutes ("AKS") 42 USC 1320 (b)(2).

5.      Relator, Balbina Castillo, hereby files the instant complaint in accordance with the requirements of the False Claims Act, 31 U.S.C. §3730(b)(2) and the relevant state statutes, as listed above.

## II.   PARTIES

### A. Relator

6.      Balbina Castillo is a resident of Davenport, Florida.  After graduating from high school, Ms. Castillo attended Polk State College in Winter Haven, Florida.   Ms. Castillo began employment with Defendants in May 2012 as a billing representative and less than one year later was given the additional responsibility of stat dispatcher. In 2014 Ms. Castillo was promoted to supervisor of the billing department and, on November 5, 2019, was promoted to the position of Billing Office Manager. Prior to her employment with Defendants, Ms. Castillo served as a Patient Coordinator with Four Corner Pediatrics in Davenport, Florida and, prior to that, served as Office Manager for The Mailbox Center in Haines City, Florida.

7.      Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B).

### B. Defendants

8.      Vista Clinical Diagnostics, LLC, was registered with the Florida Secretary of State on July 16, 2003. The company has a registered principal address of 3705 S. Highway 27, Clermont, Florida 34711. The registered agent for the company is listed as Walters McCartney, 222 W. Comstock Avenue, Suite 208, Winter Park, Florida 32789. The authorized person is listed as Davian S. Santana, 3705 S. Highway 27, Clermont, Florida 34711. The company is presently shown as active with the state.

9.      Advanced Clinical Laboratories, Inc., was registered with the Florida Secretary of State on May 1, 2003 The company has a registered principal address of 3705 S. Highway 27, Suite 201, Clermont, Florida 34711. The registered agent for the company is listed as Walters McCartney, 222 W. Comstock Avenue, Suite 208, Winter Park, Florida 32789. The Officer/Director listed is

Paradigm Healthcare, LLC, 3705 S. Highway 27, Suite 201, Clermont, Florida 34711. The company is presently shown as active with the state.

10.     Access Dermpath, Inc., was registered with the Florida Secretary of State on February 1, 2009. The company has a registered principal address of 3705 S. Highway 27, Suite 201, Clermont, Florida 34711. The registered agent for the company is listed as Walters McCartney, 222 W. Comstock Avenue, Suite 208, Winter Park, Florida 32789. The Officer/Director listed is Davian Santana. The company is presently shown as active with the state.

11.     CF Medical Billing, LLC, was registered with the Florida Secretary of State on November 1, 2009.  The company has a registered principal address of 3705 S. Highway 27, Suite 203, Clermont, Florida 34711.  The registered agent for the company is listed as Theresa Stone, 3705 S. Highway 27, Suite 203, Clermont, Florida 34711. The authorized person listed as Manager is Theresa Stone.

12.     Per the Vista Clinical Diagnostics, LLC website:

Davian Santana realized his vision when "*Vista Clinical Diagnostics was incorporated in July 2003 and opened its doors for business in January 2004. Headquartered in Clermont, Florida, Vista Clinical is currently contracted with over 230 skilled nursing homes and services assisted living facilities throughout Florida, North Carolina, South Carolina, Virginia, and Indiana. Clinical specimens are tested at the state-of-the-art, 35,000 square foot facility in Clermont, as well as laboratories in Lake City and Danville, VA. The current clinical laboratory services offered include pathology and a variety of blood tests – the scope of which include chemistry, coagulation, immunochemistry, hematology, microbiology, molecular testing, serology, urinalysis, and molecular testing."* Davian Santana is listed as Founder & President of the company on the same website. Santana held a speech at the annual company Christmas party when the macros were first

created and mentioned in his speech how Vicki Tilton had created the macros that were being utilized to "simplify" the billing process and specifically emphasized how great the macros she had created were. All changes within the company must be personally approved by Santana.

## III.   THE NATURE OF THE CASE

13.     Relator began employment with Defendants on May 24, 2012 and was initially hired as a billing representative. After less than a year, Relator was given the additional position and responsibility of stat dispatcher. Defendants offer a "stat" or immediate service to the many facilities they service. With this service, instead of a facility having to send a critical patient out to a hospital, a physician can order lab work to be drawn on the patient as soon as possible. The facility will then call in the "stat" order and a phlebotomist is then dispatched to draw the required specimens and those specimens are then dropped off at a contracted "stat" hospital with results normally returned to the facility within a 4-hour window. While Relator had this responsibility, she would work as a biller during business hours and, when on call, would have the additional responsibility of handling the "stat" requests during a 24-hour period. This was a very stressful position for Relator to hold and the position was later brought in-house requiring the "stat" employee to work out of the corporate office instead of being on call. Once the "stat" position was brought in-house, Relator was promoted to supervisor of the billing department and, on November 5, 2019, was promoted to the position of Billing Office Manager.

14.     Sometime in late 2014 or early 2015, Relator was instructed by Defendant's Director of Business Development & Operations, Vicki Tilton, to manually add certain diagnosis codes to Medicare or Medicaid beneficiary reimbursement submission forms. After the patient load began to grow and the number of diagnosis codes also expanded, Vicki Tilton created computer "macros"

which allow for certain diagnosis codes to be added to a reimbursement submission by selecting a group of patients at one time within Defendant's billing report which is maintained in an Excel format. Vicki Tilton informed Relator that adding diagnosis codes had been ordered by Patricia Owen, Vice President for Defendants, and had been created by Patricia Owen and Theresa Stone from Defendant CF Medical Billing who is a third-party biller located at Defendant Vista Clinical Diagnostics, LLC, corporate headquarters.

15.     Relator was later informed by Vicki Tilton and Patricia Owen that since laboratory billing is one of the most difficult services to bill, adding diagnosis codes would ensure payment and/or a certain reimbursement rate.

16.     Relator has first-hand knowledge that the International Statistical Classification of Diseases ("ICD") codes that are added are not diagnosis approved by the ordering physician and have no relation to the patient's true medical condition. At first, Relator was the sole person who was instructed by her supervisor to perform the task of adding ICD codes, and it was only ever discussed verbally, never in writing. Once the volume of patients/billing reports grew, Relator was no longer able to maintain this task on her own and was eventually given permission by Vicki Tilton and Patricia Owen to train other employees how to "add the diagnosis codes using the computer macros". At the present time, Relator and one other employee, Shannon Russell, perform the task of adding the ICD codes or "code jamming". Relator did not become aware, until recently, that the wholesale adding of ICD codes to billing statements was fraudulent.

17.     Relator first became aware that Defendants were engaged in "swapping" in violation of the AKS in July-August 2019 when Relator's supervisor, Vicki Tilton, assigned her the task of entering contract terms into Defendant's invoicing system. As part of this new assignment, Relator was required to review each contract and input into the invoicing system the discount each facility

received. Defendants are engaged in "swapping" of services at a discounted rate in exchange for referral business that is billed at the customary rate. Defendants are offering inducements to SNF clients in the form of reduced rates for Medicare Part A services in return for referrals from the SNF clients for Medicare Part B services that are billed at the full "fee for service" amount.

## IV.    EXAMPLES OF BILLING FRAUD

18.    Defendants have fraudulently billed, and continue to fraudulently bill, Medicare and Medicaid by adding ICD codes to Medicare or Medicaid beneficiary's reimbursement submission reports to ensure payment and/or guarantee a higher rate of reimbursement.

19.    Defendants have also fraudulently billed, and continue to fraudulently bill, Medicare and Medicaid, by engaging in a "swapping" scheme with numerous SNF clients.

20.    The following samples are not meant to limit the scope of Relator's allegations, but rather provide a window into the fraud Defendants are committing.


## CODE JAMMING

### Vista Clinical Diagnostics, LLC Danville, Virginia Laboratory

21.    Defendant Vista Clinical Diagnostics, LLC, maintains a laboratory at 3303 North Main Street, Suite C, Danville, Virginia 24540 and bills Medicare, Medicaid and other insurers using National Provider Identifier Standard (NPI) number 1780001859. The following are examples of Medicare and Medicaid beneficiaries who have had diagnosis codes added to their reimbursement submissions that have no relation to their actual medical condition.

### A. Medicare Patient A[1]

---

[1] Patient names have been anonymized, but have been provided to the government in advance of this filing.

22.     On April 12, 2017, Medicare beneficiary A, submitted a specimen for testing as ordered by her provider, Imran Haque. CPT codes 81001 and 87086 and ICD-9 code N39.0 were used by Haque when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-9 code R31.9 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**B. Medicare Patient B**

23.     On April 12, 2017, Medicare beneficiary B, submitted a specimen for testing as ordered by her provider, Michael Piazza. CPT codes 80053, 82610, 84443, 84439, 82306 and ICD-9 code Z79.899 were used by Piazza when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-9 code E55.9 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**C. Virginia Medicaid Patient C**

24.     On May 28, 2019, Virginia Medicaid beneficiary C, submitted a specimen for testing as ordered by his provider, Dr. William Ward. ICD-10 codes of F32.9, I50.94 and F01.51 were used by Ward when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes E78.5, R56.9 and D64.9 were added to the billing submission to Virginia Medicaid to ensure payment and/or a higher reimbursement rate.

**D. Medicare Patient D**

25.     On September 13, 2019, Medicare beneficiary D, submitted a specimen for testing as ordered by her provider, Jonathan Shenk. CPT codes 80053, 84443, 85025, 83036 and ICD-10 codes E11.8 and I10 were used by Shenk when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes E03.9 and D64.9 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**E. Medicare Patient E**

26.     On September 3, 2019, Medicare beneficiary E, submitted a specimen for testing as ordered by her provider, Arun Grover. An ICD-10 code of E11.22 was used by Grover when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes E78.5, E55.9, E11.9 and D64.9 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**F. Medicare Patient F**

27.     On October 4, 2017, Medicare beneficiary F, submitted a specimen for testing as ordered by her provider, Laura Hannon. An ICD-9 code of N39.0 was used by Hannon when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-9 code R31.9 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**G. Medicare Patient G**

28.     On December 6, 2018, Medicare beneficiary G, submitted a specimen for testing as ordered by her provider, Dr. Anne Alexander. An ICD-10 code of I10 was used by Alexander when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes D64.9 and Z79.899 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**H. Medicare Patient H**

29.     On December 6, 2018, Medicare beneficiary H, submitted a specimen for testing as ordered by her provider, C. Jones. ICD-10 codes of E44.0 and E02.80 were used by Jones when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes A04.7 and Z79.899 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

## I. North Carolina Medicaid Patient I

30.     On May 28, 2019, North Carolina Medicaid beneficiary I, submitted a specimen for testing as ordered by his provider, Holly Bernardini. ICD-10 codes of D64.9, I10, K76.9, E78.5, E11.9 and E05.9 were used by Bernardini when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes E55.9 and Z79.899 were added to the billing submission to North Carolina Medicaid to ensure payment and/or a higher reimbursement rate.

### Advanced Clinical Laboratories, Inc. Clermont, Florida Laboratory

31.     Defendant Advanced Clinical Laboratories, Inc., maintains a laboratory at 3705 S. Highway 27, Suite 101, Clermont, Florida 34711 3303 and bills Medicare, Medicaid and other insurers using National Provider Identifier Standard (NPI) number 1033281324.  The following are examples of Medicare and Medicaid beneficiaries who have had diagnosis codes added to their reimbursement submissions that have no relation to their actual medical condition.

## A. Medicare Patient J

32.     On December 28, 2017, Medicare beneficiary J, submitted a specimen for testing as ordered by her provider, Rick Damron. An ICD-10 code of Z79.01 was used by Damron when ordering the lab tests.  Subsequent to this specimen collection and testing, an ICD-10 code of I48.91 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

## B. Medicare Patient K

33.     On December 28, 2017, Medicare beneficiary K, submitted a specimen for testing as ordered by his provider, David Samara. ICD-9 codes Z79.01 and D64.9 were used by Samara when ordering the lab tests.  Subsequent to this specimen collection and testing, an ICD-10 code

of I48.91 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**C. Medicare Patient L**

34.    On December 28, 2017, Medicare beneficiary L, submitted a specimen for testing as ordered by her provider, Keith Williams. An ICD-9 code of R30.0 was used by Williams when ordering the lab tests. Subsequent to this specimen collection and testing, an ICD-9 code of R31.9 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**D. Medicare Patient M**

35.    On December 20, 2018, Medicare beneficiary M, submitted a specimen for testing as ordered by her provider, Vladimir Vlcko. ICD-10 codes of E11.9, E87.1 and I20 were used by Vlcko when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes of R56.9 and D64.9 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**E. Medicare Patient N**

36.    On December 20, 2018, Medicare beneficiary N submitted a specimen for testing as ordered by his provider, Dr. Yasmin Issa. ICD-10 codes of E11.9, E78.4 and I10 were used by Dr. Issa when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes of E03.9 and D64.9 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**F. Medicare Patient O**

37.    On January 20, 2020, Medicare beneficiary O, submitted a specimen for testing as ordered by her provider, Babatol Durajaiye. ICD-10 codes of I50.22 and I10 were used by Durajaiye when

ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes of R79.89 and D64.9 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**G. Medicare Patient P**

38.     On January 20, 2020, Medicare beneficiary P, submitted a specimen for testing as ordered by her provider, Leo Teytelbaum. ICD-10 codes of I50.9 and I48.91 were used by Teytelbaum when ordering the lab tests. Subsequent to this specimen collection and testing, an ICD-10 codes of D64.9 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**H. Florida Medicaid Patient Q**

39.     On January 20, 2020, Florida Medicaid beneficiary Q, submitted a specimen for testing as ordered by his provider, Ewa Piszczek. ICD-10 codes of A04.72, C32.4, D64.9 and E87.6 were used by Piszczek when ordering the lab tests.  Subsequent to this specimen collection and testing, an ICD-10 code of E03.9 was added to the billing submission to Florida Medicaid to ensure payment and/or a higher reimbursement rate.

**<u>Access Dermpath, Inc. Lake City, Florida Laboratory</u>**

40.     Defendant Access Dermpath, Inc., maintains a laboratory at 187 SW Baya Drive, Lake City, Florida 32025 and bills Medicare, Medicaid and other insurers using National Provider Identifier Standard (NPI) number 1417264011.  The following are examples of Medicare and Medicaid beneficiaries who have had diagnosis codes added to their reimbursement submissions that have no relation to their actual medical condition.

**A. Medicare Patient R**

41.     On December 28, 2017, Medicare beneficiary R, submitted a specimen for testing as ordered by her provider, David Samara. An ICD-9 code of Z79.01 was used by Samara when ordering the lab tests. Subsequent to this specimen collection and testing, an ICD-9 code of I48.91 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**B. Medicare Patient S**

42.     On January 7, 2019, Medicare beneficiary S, submitted a specimen for testing as ordered by his provider, Andrea Hoff. An ICD-10 code of R35.1 was used by Hoff when ordering the lab tests. Subsequent to this specimen collection and testing, an ICD-10 code of D64.9 was added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**C. Medicare Patient T**

43.     On February 24, 2020, Medicare beneficiary T, submitted a specimen for testing as ordered by her provider, Jaime Castellanos. An ICD-10 code of I11.0 was used by Castellanos when ordering the lab tests. Subsequent to this specimen collection and testing, ICD-10 codes of D64.9 and R06.02 were added to the billing submission to Medicare to ensure payment and/or a higher reimbursement rate.

**D. Georgia Medicaid Patient U**

44.     On January 10, 2020, Georgia Medicaid beneficiary U, submitted a specimen for testing as ordered by her provider, Lurah Welch. An ICD-10 code of E10.65 was used by Welch when ordering the lab tests. Subsequent to this specimen collection and testing, an ICD-10 code of E03.9 was added to the billing submission to Georgia Medicaid to ensure payment and/or a higher reimbursement rate.

**E. Georgia Medicaid Patient V**

45.     On January 15, 2020, Georgia Medicaid beneficiary V, submitted a specimen for testing as ordered by her provider, Aneesa Krishnamurthy. An ICD-10 code of Z79.899 was used by Krishnamurthy when ordering the lab tests.  Subsequent to this specimen collection and testing, an ICD-10 code of D64.9 was added to the billing submission to Georgia Medicaid to ensure payment and/or a higher reimbursement rate.

## SWAPPING

46.     Relator first became aware that Defendants were engaged in "swapping" in violation of the AKS in July-August 2019 when Relator's supervisor, Vicki Tilton, assigned her the task of entering contract terms into Defendant's invoicing system. As part of this new assignment, Relator was required to review each contract and input into the invoicing system the discount each facility received.

47.     Following are examples of contracts that have been signed between Defendants and various facilities where "swapping" discounts for Medicare Part B referrals has occurred:

**Fountain Manor & Rehabilitation**

48.     On October 1, 2014, Defendant Vista Clinical Diagnostics, LLC, entered into a contract for laboratory services with Fountain Manor & Rehabilitation ("FMR"), 390 NE 135th Street, North Miami, Florida. Section 3 of the contract states "FMR will receive 30% discount on prevailing Medicare fee schedule". In Section 4 of the contract Defendant Vista Clinical Diagnostics, LLC spells out language that was their reward for providing the discount: "Vista shall bill (FMR) for lab services under Medicare Part A, VA, Hospice, and Managed Care when a per diem rate applies. **Vista will be responsible for billing Medicare Part B and Private Pay directly.**" The contract was signed by Defendant Davian Santana as President of Defendant Vista Clinical Diagnostics, LLC.

**The Bristol at Tampa**

49.     On January 1, 2019, Defendant Vista Clinical Diagnostics, LLC, entered into a contract for laboratory services with The Bristol at Tampa, 1818 E. Fletcher Avenue, Tampa, Florida. Section 3 of the contract states " ("TBT") will receive 20% discount off prevailing Medicare fee schedule". In Section 4 of the contract Defendant Vista Clinical Diagnostics, LLC spells out language that was their reward for providing the discount: "Vista shall bill (TBT) for lab services under Medicare Part A, VA, Hospice, and Managed Care when a per diem rate applies. **Vista will be responsible for billing Medicare Part B and Private Pay directly.**" The contract was signed by Thomas A. Napolitano who is listed as Director of Nursing Home Operations for Defendant Vista Clinical Diagnostics, LLC.

**Universal Healthcare-Greenville**

50.     On October 30, 2015, Defendant Vista Clinical Diagnostics, LLC, entered into a contract for laboratory services with Universal Healthcare-Greenville, 2758 West 5th Street, Greenville, North Carolina 27834. Section 3 of the contract states "VRNC will received a 50% discount off the prevailing Medicare fee Schedule, excluding STAT charges". In Section 4 of the contract Defendant Vista Clinical Diagnostics, LLC spells out language that was their reward for providing the discount: "Vista shall bill (VRNC) for lab services under Medicare Part A, VA, Hospice, and Managed Care when a per diem rate applies. **Vista will be responsible for billing Medicare Part B and Private Pay directly.**" The contract was signed by Brian J. Mills who is listed as Officer or Authorized for Defendant Vista Clinical Diagnostics, LLC.

**The Villages Rehab & Nursing Center**

51.     On January 18, 2017, Defendant Vista Clinical Diagnostics, LLC, entered into a contract for laboratory services with The Villages Rehab & Nursing Center, 900 County Road 466, Lady

Lake, Florida. Section 3 of the contract states "(UHG) will be billed at Medicare fee Schedule less

15%, excluding STAT charges or draw fees". In Section 4 of the contract Defendant Vista Clinical

Diagnostics, LLC spells out language that was their reward for providing the discount: "Vista shall

bill (UHG) for lab services under Medicare Part A, VA, Hospice, and Managed Care when a per

diem rate applies. **Vista will be responsible for billing Medicare Part B and Private Pay**

**directly.**" The contract was signed by Davian S. Santana who is listed as President for Defendant

Vista Clinical Diagnostics, LLC.

## V. DAMAGES

52.     Relator estimates, based on her experience with Defendants, that a sizable portion of their

approximately $5 million plus in annual billings to Medicare and Medicaid are fraudulent based

on the wholesale adding of diagnosis codes to billing statements for the express purpose of assuring

reimbursement and/or assuring higher reimbursement. Relator knows that this fraud has been

going on since 2014 and continues to this day resulting in what could easily be $25-30 million in

fraudulent payments received from Medicare and Medicaid by Defendants.

53.     Additionally, Defendants are engaging in a "swapping" scheme that calls into question

many of the billings to Medicare and Medicaid where a contract has been made with a SNF

resulting in an illegal referral under the AKS.

54.     Defendant hid the swapping scheme from Medicare that resulted in significant savings for

the facilities and increased revenue for Defendant

55.     Tainted by these kickbacks, all services provided for under these agreements would be

rendered unnecessary, subject to the fines and penalties of the Anti-Kickback Statutes. *See U.S. v.*

*Rogan*, 517 F.3d 449, 451-52 (7th Cir.2008).

56.     Although rarely seen in qui tam cases, this case may require strong penalties to punish Defendants and warn similar providers of the consequences of their actions, lest this become the new normal.  Relator proposes that any and all FCA violations result in a civil penalty per false claim, of not less than $11,181 and not more than $22,363, plus treble the government's actual damages. (31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5 (2018).

## VI. STATUTORY AND REGULATORY FRAMEWORK

### A. THE FALSE CLAIMS ACT

57.     The FCA, as amended, provide in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $11,181 and not more than $22,363, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1).

58.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

59.     In addition to the FCA, Relators bring these claims under the state False Claims Acts or their equivalents (the state FCAs) for each state in which Defendants conducts business.  The state FCAs are largely modeled on the federal FCA with similar provisions and interpretations, but will be differentiated as necessary in individual counts below.

## B. THE ANTI-KICKBACK STATUTE

60.     The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), expressly prohibits any individual or entity from offering, paying, soliciting or receiving any "remuneration," which "include[s] any kickback, bribe, or rebate," to "any person to induce such person" to purchase or recommend a drug or service that is covered by Medicare or Medicaid. The AKS, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration given to those who can influence health care decisions would result in the provision of goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect patient and federal healthcare programs, including Medicare and Medicaid, from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.

61.     First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

62.     The AKS makes it illegal for individuals or entities to "offer or pay any remuneration, including any kickback, bribe, or rebate... to any person to induce such person ... to purchase, ... order, ... or recommend purchasing ... or ordering any good ... or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The providing of free or discounted products by a medical device company to health care providers in order to induce them to utilize products in a reimbursed setting or in order to allow the health care provider to undertake and bill for a more expensive procedure violate this statute. Violation of the AKS is a felony punishable by fines and imprisonment, and can also result in exclusion from

participation in federal health care programs.  42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a-7(b)(7).

### C. COST REPORTING AND CLAIMS PROCESSING

63.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395, et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  See 42 U.S.C. §§ 426, 426-1.

64.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services, which is an agency of the Department of Health and Human Services and is directly responsible for the administration of the Medicare Program.

65.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395(u).  In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64.  Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

66.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.  42 U.S.C. §§ 1395j-1395w-5.  The allegations herein involve Medicare Part B services billed by the Defendants to Medicare.

67.    In order to get paid from Medicare, providers, like Defendants herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed. Relator is aware that Defendant Clear Choice created claims that were sent electronically to Medicare. Defendant Clear Choice also utilized a "physician certification form" that required a physician signature at time of admission, after each thirty-day period and at other incremental periods based on the patient's length of stay.

68.    To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or TRICARE (formerly known as CHAMPUS) regulations.

That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## D. CONDITIONS OF PARTICIPATION AND CONDITIONS OF PAYMENT

69.    To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. §1395cc.  The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### i.      Medical Necessity and Appropriateness Requirements

70.      One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

71.      Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  *Id.*; *see also*, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

72.      The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

### ii.      Obligation to Refund Overpayments

73.      As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C., *see also* 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

74.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due, and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg.  CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395l(j).

### E.  MEDICAID AND TRICARE

75.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals.  CMS administers Medicaid on the federal level while the individual states administer the program on the state level. Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare.  As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

76.     TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.  Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.).  Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).  And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as

submitting claims for services that are not medically necessary, consistently furnishing medical

services that do not meet accepted standards of care and failing to maintain adequate medical

records. 32 C.F.R. §§ 199.9(b)(3)(b)(5).

### F.   CLAIMS FOR RELIEF

**COUNT I**
**False Claims Act: Presentation of False Claims**
**31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A)**

77.     Relator repeats and incorporates by reference the allegations contained in paragraphs

1-76 of this Complaint as if fully set forth herein.

78.     Defendants knowingly presented, and caused to be presented, false or fraudulent claims for

payment or approval to the United States by submitting claims for fraudulently added, also referred

to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary

reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate

in exchange for referral business that is billed at the customary rate.

79.     The United States, or its authorized agent, paid the false and/or fraudulent

claims.

80.     Had the United States known of the false of fraudulent claims for fraudulently added, also

referred to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary

reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate

in exchange for referral business that is billed at the customary rate made by Defendants, it would

have refused to authorize payment for the equipment provided by Defendants.

81.     By virtue of the false or fraudulent claims that Defendants made and/or caused to be made,

the United States suffered damages and is therefore entitled to treble damages under the FCA, to

be determined at trial, plus civil penalties of not less than $11,181 and up to $22,363 or such other

penalty as the law may permit and/or require for each violation of 31 U.S.C. §3729, *et seq.*

## COUNT II
### False Claims Act: Presentation of False Statements
### Material to False Claims (31 U.S.C. § 3729(a)(1)(B))

82.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

83.     Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims and to get such claims paid by the United States with respect to fraudulently added, also referred to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate in exchange for referral business that is billed at the customary rate.

84.     This conduct created FCA liability in that each claim for payment submitted or caused to be submitted by the Defendants to government healthcare programs was accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules.   Each of those certifications was false, because each claim for payment was tainted by failing to meet the medical necessity and appropriateness requirements.

85.     Thus, each claim to Medicare/Medicaid/Tricare from the Defendants constituted a violation of the FCA.

86.     Said false statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT III
### False Claims Act: False Record Material to Obligation to Pay
### (31 U.S.C. § 3729(a)(1)(G))

87.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

88.    Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States in the form of fraudulently added, also referred to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate in exchange for referral business that is billed at the customary rate. Additionally, along with submissions for payment they submitted records falsely certifying their compliance with federal or state statutes, regulations, or program rules when they submitted claims for payment.

89.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**COUNT IV**
**Florida False Claims Act § 68.082(a) Fla. Stat.**
**Presentation of False Claims**

90.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

91.    Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims and to get such claims paid by the state of Florida with respect to fraudulently added, also referred to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate in exchange for referral business that is billed at the customary rate.

92.    The state of Florida, or its authorized agent, paid the false and/or fraudulent claims.

93.    Had the state of Florida known of the fraudulent claims by Defendants, it would have refused to authorize payment for services provided by Defendants.

94.     By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the state of Florida has suffered substantial monetary damages.

95.     As more particularly set forth above, by virtue of the acts alleged herein Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of §68.082 (2)(a) Fla. Stat.

**COUNT V**
**Florida False Claims Act § 68.082 (2)(b)**
**Making or Using False Record Statement to Cause Claim to be Paid**

96.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

97.     As more particularly set forth above, by virtue of the acts alleged herein Defendants knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the state of Florida, or (b) material to false or fraudulent claims, in violation of §68.082 (2)(b) Fla. Stat.

98.     By engaging in the above conduct, Defendants knowingly caused the submission of false or fraudulent claims for payment to the state of Florida, and knowingly caused the use of or reliance upon false statements, resulting in the payment of false or fraudulent claims. 31 U.S.C. §3729(a)(1) and (2).

99.     Had the state of Florida known about the false records certifying compliance with state and federal laws, they would not have paid the claims of Defendants.

100.    By virtue of the false records or statements Defendants made or caused to be made, the state of Florida has suffered substantial monetary damages.

101.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements

– i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of §68.082 (2)(b) Fla. Stat.

### COUNT VII
### Virginia Fraud Against Taxpayers Act
### (Va. Code Ann. § 8.01-216.1, *et seq.*)

102.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

103.    Defendants violated the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3 (A)(1) and (A)(2) by knowingly making, using, or causing to be made or used, submission for reimbursement to the Commonwealth for fraudulently added, also referred to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate in exchange for referral business that is billed at the customary rate.

104.    Defendants in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, to an officer or employee of the Commonwealth of Virginia, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3 (A)(1).

105.    Defendants in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, false records or false statements to get claims paid or approved by the Commonwealth, in violation of Va. Code Ann. § 8.01-216.3 (A)(2).

106.    The Commonwealth, unaware of the falsity of the claims, records, or statements made by Defendants, and in reliance on the accuracy of these claims, records, or statements, approved, paid,

and participated in payments made for claims that otherwise would not have been paid.

107.    As a result of Defendants' actions, the Commonwealth of Virginia has been damaged, and she is liable to the Commonwealth for three times the amount of the Commonwealth actual damages. Additionally, Defendants are liable to the Commonwealth for civil penalties to be determined by the Court in an amount between $5,500.00 and $11,000.00 for each violation of Va. Code Ann. § 8.01-216.3 (A)(1) and (A)(2).

**COUNT VIII**
**Presentation of False Claims**
**Georgia False Medicaid Claims Act O.C.G.A. §49-4-168 et. seq.**

108.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

109.    Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims and to get such claims paid by the state of Georgia with respect to fraudulently added, also referred to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate in exchange for referral business that is billed at the customary rate.

110.    O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(1)    knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)    conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

111.    Defendant violated O.C.G.A. § 49-4-168.1(a)(1), (2) and (3) by engaging in the conduct described herein and knowingly caused false claims to be made, used and presented to the state of Georgia by its deliberate and systematic violation of federal and state laws. .

## COUNT IX
### Making or Using False Record Statement to Cause Claim to be Paid
### Georgia False Medicaid Claims Act O.C.G.A. §49-4-168 et. seq.

112.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

113.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of Georgia False Medicaid Claims Act.

## COUNT X
### Making or Using False Record Statement to Avoid an Obligation to Refund
### Georgia False Medicaid Claims Act O.C.G.A. §49-4-168 et. seq.

114.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

115.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay to the state of Georgia.

## COUNT XI
### North Carolina False Claims Act,
### Pursuant to N.C. Gen. Stat. § 1-607

116.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as if fully set forth herein.

117.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

118.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

119.   The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for fraudulently added, also referred to as "code jamming", diagnosis codes to patients Medicare or Medicaid beneficiary reimbursement submissions and engaged in "swapping" of laboratory services at a discounted rate in exchange for referral business that is billed at the customary rate for recipients of health insurance programs funded by the state or its political subdivisions.

120.   As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, damaged.

## G. PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States of America and the states of Florida, Virginia, Georgia, and North Carolina demands judgment against the Defendants, ordering that:

**As to the Federal Claims:**

a.      That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*

b.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States government has sustained because of Defendants' actions, plus a maximum civil penalty for each false claim, together with the costs of this action, with interest, including the cost to the United States government for its expenses related to this action.

c.      That this Court enters judgment against Defendants for the maximum amount of actual damages under 31 U.S.C. §3729 *et seq.*

d.      That Relator be awarded all costs incurred, including attorneys' fees.

e.      That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

**As to the Claims on behalf of the state of Florida:**

a.      Pursuant to section 68.082, Defendants pay an amount equal to three times the amount of damages the state of Florida has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of § 68.081 *et seq*;

b.      Relator be awarded the maximum amount allowed pursuant to section 68.085 of Florida Statutes and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by section 68.085 and any other applicable provision of the law; and

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the Claims on behalf of the Commonwealth of Virginia:**

a.      Pursuant to Va. Code Ann. § 8.01-216.1(a)(7), Defendants pay an amount equal to three times the amount of damages the Commonwealth has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of § 8.01-216.1, *et seq.*;

b.      Relator be awarded the maximum amount allowed pursuant to § 8.01-216.7(A) and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by § 8.01-216.1(a)(7), and any other applicable provision of the law; an

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the Claims on behalf of the state of Georgia:**

a.      Pursuant to the Georgia False Medicaid Claims Act, O.C.G.A. §49-4-168 et. seq., Defendants pay an amount equal to three times the amount of damages the state of Georgia has sustained because of Defendants' conduct, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of the Georgia False Medicaid Claims Act;

b.      Relator be awarded the maximum amount allowed pursuant the Georgia False Medicaid Claims Act and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by the Georgia False Medicaid Claims Act and any other applicable provision of the law; and

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the Claims on behalf of the state of North Carolina :**

a.      Pursuant to section 1-607, Defendants pay an amount equal to two times the amount of damages the state of North Carolina has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of § 1-605. *et seq*;

b.      Relator be awarded the maximum amount allowed pursuant to section 1-610 of North Carolina Statutes and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by section 1-610 and any other applicable provision of the law; and

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**DEMAND FOR JURY TRIAL**

Date: April 7, 2020

Respectfully submitted,

BY: */s/ James D. Young*
James D. Young (FBN 567507)
jyoung@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Facsimile

Juan Martinez (FBN 1013923)
juanmartinez@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 393-5463 Telephone

*Attorneys for Plaintiff/Relator*